UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MORRIS Z. RIZKALLAH and NADIA E.
RIZKALLAH, Individually and Doing
Business as PAINTED APRONS MOTEL,

                Plaintiffs,

        - against -

FORWARD AIR, INC., FAF, Inc., MARK
E. LEGGUE, and GREAT WEST
CASUALTY COMPANY,

              Defendants.

02 Civ. 2448 (PGG)

MEMORANDUM OPINION
AND ORDER

PAUL G. GARDEPHE, U.S.D.J.:

        On February 28, 2001, a tractor-trailer owned by Defendant Forward Air

Freight, Inc. ("FAF") broke through a guardrail on Interstate 84 and came to rest on

property belonging to Plaintiffs Morris and Nadia Rizkallah.  The accident and

subsequent removal of the truck caused damage to the Rizkallahs' property, including the

destruction of many trees and shrubs, and led to this litigation.

        The Rizkallahs claim, inter alia, that Defendant Great West Casualty

Company ("Great West") – FAF's insurer – breached an agreement with them to restore

their property to its pre-accident condition.  Alternatively, the Rizkallahs claim that Great

West is liable to them under (1) a theory of fraudulent misrepresentation; or (2) under

N.Y. Real Property Act § 861 (1963), which provides a cause of action to owners whose

trees have been cut down without their consent.  Great West has moved for summary

judgment on all three causes of action.  For the reasons set forth below, Great West's

motion is GRANTED.

## I.     <u>BACKGROUND</u>

### A.     **The February 28, 2001 Accident and the Removal <u>of the Tractor-Trailer From the Rizkallahs' Property</u>**

The Rizkallahs own and operate the Painted Aprons Motel, which is

located off Interstate 84 in a densely wooded area outside Port Jervis, New York.  (Def.

R. 56.1. Stat. ¶ 1,[1] Ex. E at 59:25; Pltf. R. 56.1 Stat. ¶ 1, Ex. 6 at 40:12-14)  In the early

morning hours of February 28, 2001, a truck operated by an FAF driver broke through

the guardrail on Interstate 84, traveled down an embankment, and landed on Plaintiffs'

property.  (Def. R. 56.1 Stat. ¶¶ 1-2)

The New York State Police became aware of the accident and made

arrangements for a heavy equipment operator – George Fuller of D&H Garage – to

remove the truck from the Rizkallahs' property.  (Def. R. 56.1 Stat. ¶ 8)  Fuller went to

the Rizkallahs' home to obtain permission to remove the truck.  (<u>Id.</u>)  Morris Rizkallah

told Fuller that he would not permit anyone to remove the truck until he had examined

the accident scene.  (<u>Id.</u> ¶ 9)

Wesley Robin, a Great West claims adjuster, learned of the accident that

morning, and received a fax stating that the landowner "want[ed] a letter stating that his

property will be taken care of."  (Def. R. 56.1 Stat. ¶ 14, Ex. I; Pltf. R. 56.1 Stat. ¶ 10)

---

[1]  Unless otherwise noted, citations to the parties' Rule 56.1 statements concern factual assertions that are admitted, are deemed admitted – because they were neither admitted nor denied by the opposing party – or have not been contradicted by citations to admissible evidence.  <u>See</u> <u>Gianullo v. City of New York</u>, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citation omitted).

Robin faxed a note to Nadia Rizkallah asking her to call him "ASAP," and Great West arranged for its casualty adjuster, Crawford & Co., to go to the accident scene. (Pltf. R. 56.1 Stat. ¶ 11; Def. R. 56.1 Stat. ¶ 14)

When the Crawford & Co. adjuster arrived at the accident site later that morning, he took photographs of the scene, spoke to Fuller about obtaining the Rizkallahs' permission to retrieve the truck,[2] and checked on the condition of the truck. (Def. R. 56.1 Stat. ¶¶ 14 -15, 18-19)  In the vicinity of the truck – which had come to rest in a wetlands area – the adjuster noticed a strong odor of diesel fuel. (Def. R. 56.1 Stat., Ex. E at 56:17-22)  He discovered that the truck's fuel tank had ruptured, and observed that it was leaking diesel fuel into the ground and into a nearby stream. (Def. R. 56.1 Stat. ¶ 21, Ex. E at 75:4-6, 76:4-10)  The adjuster called 911. (Def. R. 56.1 Stat. ¶ 22, Ex. E at 79:13-14)

Andy Cope – an insurance adjuster who works for FAF – then arrived at the accident scene[3] and took over the investigation from the Crawford & Co. adjuster. (Def. R. 56.1 Stat. ¶ 24; Pltf. R. 56.1 Stat., Ex. 8 at 96:22-25)  Cope spoke that morning with Nadia Rizkallah.[4]  Mrs. Rizkallah claims that she suggested that the truck be

---

[2]  Great West cites the adjuster's deposition testimony in asserting that Morris Rizkallah demanded $10,000 from Fuller before he would allow anyone to recover the truck. (Def. R. 56.1 Stat., Ex. E at 54:2-7)  The adjuster's account of what Fuller told him Rizkallah had said, however, is hearsay, see Fed. R. Evid. 801(c), and the Court cannot rely on it in ruling on Great West's summary judgment motion. See Bridgeway Corp. v. Citibank, 201 F.3d 134, 142 (2d Cir. 2000) ("Summary judgment cannot be granted on the basis of inadmissible evidence.").

[3]  Because FAF was self-insured for claims up to $100,000, such claims were handled by FAF's own adjusters. (Def. R. 56.1 Stat. ¶¶ 3, 5-6)

[4]  Great West relies on a March 6, 2001 letter Cope wrote to another FAF adjuster summarizing his investigation. (Def. R. 56.1 Stat., Ex. G)  Although insurance carriers'

removed via Interstate 84, while Cope attempted to persuade her that it was more practical for the truck to be removed through the Rizkallahs' property.[5]  (Pltf. R. 56.1 Stat. ¶ 14)  Mrs. Rizkallah also testified that Cope told her that Great West "had a good reputation," "was a great company," and "would do whatever the Rizkallahs wanted them to do if they permitted the tractor-trailer to [be] pulled through their property." (Id.)  Even though Cope told her that Plaintiffs "would be compensated for any damage which the removal caused and their property would be restored," Mrs. Rizkallah insisted that he provide a written statement to this effect before granting permission to have the truck removed through Plaintiffs' property.  (Id.)

Mrs. Rizkallah also testified that she spoke that morning by telephone with an unidentified Great West employee and told this person that a "tractor-trailer had fallen down on our property and . . . that if the trailer was pulled through our property we wanted them to write in a document that they were going to restore whatever damage they were going to do, restore the property to its pre-accident condition, plant any trees

---

investigative reports may sometimes fall under the business record exception to the hearsay rule, see, e.g., Sana v. Hawaiian Cruises, Ltd., 181 F.3d 1041, 1046-57 (9th Cir. 1999) (applying business record exception to insurance company's investigative report because company had no incentive to manufacture evidence regarding plaintiff's illness; because the report had circumstantial guarantees of trustworthiness; and because the claims adjuster had a duty to report accurate information when writing the report); see also United States v. Bortnovsky, 879 F.2d 30, 34 (2d Cir. 1989) (an "adjuster's report might otherwise qualify as a business record" but for the fact that it contained hearsay statements made by a person who had no duty to report information), Great West has not provided an adequate foundation for this Court to conclude that Cope's report constitutes a business record under Fed. R. Evid. 803(6).  Accordingly, the Court cannot rely on it in deciding Great West's summary judgment motion.

[5] Cope testified at his deposition that the slope of the embankment down which the truck had traveled, and the fact that Interstate 84 would have to be shut down to permit recovery of the vehicle from that approach, made it more practical for the truck to be removed through Plaintiffs' property.  (Def. R. 56.1 Stat., Ex. F at 13:4-23)

they cut and compensate us for anything that is not available." (Pltf. R. 56.1 Stat. ¶ 22, Ex. 9 at 21:11-21) The Great West employee told Nadia that someone from the company would "get back to [the Rizkallahs]." (Pltf. R. 56.1 Stat. ¶ 22, Ex. 9 at 21:23)

Great West's Wesley Robin spoke by telephone with Nadia Rizkallah sometime before noon. (Pltf. R. 56.1 Stat. ¶ 21, Ex. 5 at 39:23-25) Mrs. Rizkallah told Robin that the Rizkallahs "wanted an assurance that once the tractor trailer was removed from the[ir] property, there would be an insurance company available to address the issue of any damage to their property." (Def. R. 56.1 Stat. ¶ 36) Robin assured Mrs. Rizkallah that "there was an insurance company who would address their claim after the truck was removed." (Id. ¶ 38)

At 12:43 p.m., Robin received an email from another Great West employee stating that "Nadia Rizkallah called and said she was waiting for a fax from you. Says you are holding everyone up . . . Please handle." (Pltf. R. 56.1 Stat. ¶ 23) At about this time, FAF's Cope again attempted to persuade the Rizkallahs to permit removal of the truck through their property, but Morris Rizkallah insisted on waiting for the fax transmission from Great West.[6] (Id. at ¶ 29, Ex. 2 ¶ 10)

---

[6] Great West alleges that during this time, Morris Rizkallah demanded various sums of money ranging from $100,000 to $1 million in exchange for granting permission for removal of the truck. (Def. R. 56.1 Stat. ¶ 28) To the extent that Great West relies on Cope's report, as noted above, it has not established that this report is admissible under the business record exception to the hearsay rule. Accordingly, for purposes of this motion, this Court cannot rely on Cope's report. With respect to Cope's deposition, and the deposition of New York State Department of Environmental Conservation employee Delores Wehrfritz, both witnesses testified that they could not recall the substance of their conversations with Morris Rizkallah. (Def. R. 56.1 Stat., Ex. F at 15:5-12; Pltf. R. 56.1 Stat., Ex. 11 at 25:13-26:14) In any event, there are material issues of fact concerning these allegations, because Morris Rizkallah denies demanding any such payment. (Pltf. R. 56.1 Response at 3-4)

Robin then sent the following fax to Morris Rizkallah, which is the basis

for the Rizkallahs' claims against Great West:

> Mr. Rizkallah,
>
> It is my understanding that a vehicle owned by one of my insureds,
> Forward Air Corporation, is presently on your property.  Please allow
> D&H Garage and RM Excavating to enter your property so that they may
> remove the vehicle.  If I understand the facts, this entry onto your property
> has caused damage, and the removal of the unit will entail further damage.
> Please be assured that Forward Air Corporation maintains a policy of
> insurance with Great West Casualty Co. for such accidents.  I will be the
> adjuster who works with you in restoring your property to pre-accident
> condition or compensating you for damage that is irrepairable [sic].
> Please contact me if you should have any questions.  Thank you for your
> help.  Wesley Robin

(Def. R. 56.1 Stat., Ex. I)  At his deposition, Robin testified that he "understood at the

time that part of the damage to the property was damaged trees and shrubs[,] and that

would be part of the something we would consider doing to address the damage that had

occurred to this property."  (Pltf. R. 56.1 Stat., Ex. 5 at 87:19-23)

Morris Rizkallah alleges that he consented to the truck's removal at about

1:30 p.m., immediately after receiving Robin's fax.[7]  (Pltf. R. 56.1 Stat. ¶ 48, Ex. 2 ¶ 13)

Both Morris and Nadia Rizkallah allege that – but for Robin's fax – they would not have

permitted the truck to be removed through their property.  (Pltf. R. 56.1 Stat. ¶¶ 50-51,

Ex. 1 ¶ 10, Ex. 2 ¶ 16)  Removal of the truck through the Rizkallahs' property

---

[7]  Great West argues that Morris Rizkallah refused to permit the truck to be removed even
after he received the fax and that the New York State Police had to order the truck's
removal.  (Def. R. 56.1 Stat. ¶ 42)  Great West admitted in its Amended Answer,
however, that "plaintiffs allowed defendants access to the property to remove the tractor
trailer which entailed removing some vegetation from the property.  (Amended Ans. ¶
39)  Because "[f]acts admitted in an answer . . . are judicial admissions that bind the
defendant throughout . . . litigation," Gibbs v. CIGNA Corp., 440 F.3d 571, 578 (2d Cir.
2006), Great West is bound by its admission that the Rizkallahs permitted Defendants to
remove the truck from their property.

"necessitated the cutting of trees and bushes and creating a path . . . [with a] bulldozer, backhoes and chainsaws."  (Pltf. R. 56.1 Stat. ¶ 50).

Because of prior insurance claims, Mr. Rizkallah understood the insurance claims adjustment process and was aware that it would involve negotiation that might lead to a settlement.  He testified:

> The normal process which I had been through on other occasions . . . I'm going to place a claim to the insurance company, they're going to send me their own adjustor.  He's going to come up with his own estimate, and again, if I feel that what he's doing makes sense, then I would agree to it. If I feel it didn't make sense I would be hiring a public adjustor to take [up] that issue with the insurance adjustor.  That was my understanding of a settlement.

(Def. R.56.1 Stat., Ex. C at 41:17-42:6)

## B. The Claims Adjustment Process

Despite the oral and written communications between Great West and the Rizkallahs on the day of the accident, there is no evidence that there was any contact between Great West and the Rizkallahs after that date.  While there is no evidence that Wesley Robin or anyone else from Great West "work[ed] with [the Rizkallahs to] restor[e their] property to pre-accident condition," there is likewise no evidence that the Rizkallahs ever approached or communicated with Robin or any other Great West employee – after the day of the accident – about this incident, about Robin's fax, or about any other matter.

Instead, the Rizkallahs pursued their claim for insurance coverage solely through FAF's Cope.  Cope obtained an estimate from an excavation company for grading, debris removal, stump removal, and seeding of the area damaged by the removal of the truck.  (Def. R. 56.1 Stat., Ex. K)  The estimate indicates that the total cost to

remove the trees and brush that were cut or destroyed, to grade the area, haul in replacement topsoil and re-seed, would be $9,650.  (Def. R. 56.1 Stat. ¶ 51, Ex. K)  On April 18, 2001, Cope spoke by telephone with Morris Rizkallah, and offered to settle his property damage claim for $9,650.  (Def. R. 56.1 Stat., Ex. M)  During that call, Rizkallah expressed concern that his driveway had been damaged by the heavy equipment used during the recovery process.  (Id.)  Accordingly, Cope increased his settlement proposal to a "full and final" offer of $15,000 "to cover the repair cost for the possible driveway damage."  (Def. R. 56.1 Stat. ¶ 54, Ex. M)

On April 23, 2001, Morris Rizkallah responded, writing that "the figures you assigned for the repairs are fair" but that Cope's proposal "did not account for the replacement of the trees."  (Def. R. 56.1. Stat. ¶ 55, Ex. N)  Rizkallah attached to his letter an estimate from a tree service indicating that the cost to replace the lost trees and shrubs would be $440,000.[8]  (Def. R. 56.1 Stat. ¶ 55, Exs. N, O)  Morris Rizkallah concluded by explaining that if the parties were "not able to come to an agreement on this matter, [he would] be obligated to hire an Independent New York State Adjuster in order to estimate the total cost needed to restore the property to pre-accident condition or compensate [him] for damage that is irrepairable [sic], as promised by Wesly [sic] Robin of Great West Casualty Company in his fax to me dated 2/28/01 at 11:55:20."  (Def. R. 56.1 Stat., Ex. N)

---

[8]  Great West argues that the estimate submitted by Rizkallah contemplated the use of ornamental hardwood trees and flowering shrubs, and not the scrub growth destroyed on the day of the accident, which had no value.  (Def. R. 56.1 Stat. ¶ 60)  This assertion is based on a July 31, 2001 letter from Cope to another FAF adjuster, however (see Def. R. 56.1 Stat., Ex. T), which has not been qualified as a business record under Fed. R. Evid. 803(6).  Accordingly, the Court cannot rely on this assertion in deciding Great West's motion.

On June 4, 2001, FAF's Cope returned to the accident site to re-inspect the Rizkallahs' property.  (Def. R. 56.1 Stat. ¶ 58)  Cope took photographs of the area through which the truck had been removed.  (Id.)  Those photographs indicate that the area was strewn with garbage, such as discarded refrigerators and furniture and what appears to be construction debris.  (Def. R. 56.1 Stat., Ex. Q at Photos 11-12, 20, 22, 24) On June 20, 2001, Cope sent another letter to Morris Rizkallah in which he explained that, after his June 4, 2001 re-inspection, he had been "instructed to offer you a full and final settlement amount of $15,000 for your property damage."  (Def. R. 56.1 Stat. ¶ 59, Ex. S)  The Rizkallahs did not accept Cope's offer, and in October 2001, they filed this lawsuit.[9]  (Id. ¶ 61)

### C.    The Amended Complaint

In their January 8, 2003 Amended Complaint, the Rizkallahs brought five causes of action including:  (1) a claim against Forward Air, FAF, Inc. and FAF's driver for negligence; (2) a claim against Great West, Forward Air, and FAF, Inc. for breach of contract; (3) a claim against Great West, Forward Air, and FAF, Inc. for fraudulent misrepresentation; (4) a claim against all Defendants for a violation of N.Y. Real. Prop. Act § 861; and (5) a claim against all Defendants for trespass.

On September 7, 2006, Great West moved for summary judgment on Plaintiffs' claims for breach of contract, fraudulent misrepresentation, and for a violation of N.Y. Real Prop. Act § 861. On October 9, 2008, this action was re-assigned to this Court.

---

[9]  During discovery, Plaintiffs obtained an affidavit from an arborist indicating that none of the damage to their property is irreparable and that the total cost of the tree, shrub and site restoration would be at least $230,787.  (Pltf. R. 56.1 Stat., Exs. 3-3C)

## DISCUSSION

Great West argues that it is entitled to summary judgment on Plaintiffs'
breach of contract claim because the February 28, 2001 fax constitutes an agreement to
agree and not an enforceable contract.  As discussed below, there is no evidence that
Plaintiffs ever made a demand on Great West to restore their property to its pre-accident
condition or that Great West rejected such a demand.  Even if there was evidence of
breach, however, the terms of the February 28, 2001 fax – which is the alleged contract
here – are not sufficiently definite to constitute an enforceable contract.  Although New
York courts enforce agreements that omit critical terms such as value or price, they do so
only when the parties have specified a methodology, or extrinsic event, condition or
standard, that may be utilized to supply the missing contract term.  The alleged agreement
at issue here does not refer to any such external standard or objective methodology, and –
at best – constitutes an expression of intent on Great West's part to "work with [the
Rizkallahs] in restoring [their] property to pre-accident condition."  (Def. R. 56.1 Stat.,
Ex. I)  Such aspirational expressions do not provide a basis for a court to find an
enforceable agreement.

Great West is also entitled to summary judgment on the Rizkallahs'
fraudulent misrepresentation claim, because Robin's statement in the February 28, 2001
fax is too indefinite to sustain a fraud claim.  As explained below, a mere promise to
negotiate is insufficient to warrant reasonable reliance.

Finally, the Court will grant Great West summary judgment on Plaintiffs'
real property cause of action because it is undisputed that the Rizkallahs consented to the

removal of their trees and shrubs, and their consent – at least as to Great West – was not procured through fraud.

## I.      **SUMMARY JUDGMENT STANDARD**

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact."  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  "A fact is material for these purposes if it might affect the outcome of the suit under the governing law."  Overton v. New York State Div. of Military & Naval Affairs, 373 F.3d 83, 89 (2d Cir. 2004) (quotations omitted).  In ruling on a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

Because this Court's subject matter jurisdiction is based on diversity of citizenship, the Court will apply New York law, which the parties agree governs.  See, e.g., JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009) (applying New York law to a contract where the parties agreed it governed their dispute); Powell v. Omnicom, 497 F.3d 124, 129 n.1 (2d Cir. 2007) (applying New York law where parties implicitly agreed that it governed their contract dispute).

## II.   LEGAL ANALYSIS

### A.   Great West Is Entitled to Summary Judgment on Plaintiffs' Breach of Contract Claim

#### 1.   Applicable Law

"Few principles are better settled in the law of contracts than the requirement of definiteness."  Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 482 (1989).  "If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract."  Id.  New York courts do not "appl[y] the definiteness doctrine rigidly," however.  As the New York Court of Appeals has explained:

> Contracting parties are often imprecise in their use of language, which is, after all, fluid and often susceptible to different and equally plausible interpretations.  Imperfect expression does not necessarily indicate that the parties to an agreement did not intend to form a binding contract. A strict application of the definiteness doctrine could actually defeat the underlying expectations of the contracting parties.  Thus, where it is clear from the language of an agreement that the parties intended to be bound and there exists an objective method for supplying a missing term, the court should endeavor to hold the parties to their bargain.  Striking down a contract as indefinite and in essence meaningless is at best a last resort.

166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp., 78 N.Y.2d 88, 105-06 (1991) (citations omitted and quotations omitted); see also Reiss v. Fin. Performance Corp., 97 N.Y. 2d 195, 961 (2001) ("An omission or mistake in a contract does not constitute an ambiguity. . . .) (quotation omitted).

Here, Great West argues that the February 28, 2001 fax is an agreement to agree and is not enforceable, because it leaves certain material terms, including the value of the Rizkallahs' insurance claim, to future negotiations.  The New York Court of

Appeals has explained, however, that "the requirement of definiteness [can] be satisfied

[even] in the absence of an explicit contract term" where:

> (1) an agreement . . . contain[s] "a methodology for determining the
> [missing term] . . . within the four corners of the [agreement], for a [term]
> so arrived at would have been the end product of agreement between the
> parties themselves"; or (2) an agreement . . . "invites recourse to an
> objective extrinsic event, condition or standard on which the amount was
> made to depend."

166 Mamaroneck Ave. Corp., 78 N.Y.2d at 91-92 (quoting Joseph Martin, Jr.,

Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 110 (1981)).  Here, Robin represented

in his fax that – through the claims adjustment process – he would "work[] with the

[Rizkallahs] in restoring [their] property to pre-accident condition."  (Def. R. 56.1 Stat.,

Ex. I)

New York courts routinely enforce agreements where a price term is to be

determined through reference to an outside methodology or by an extrinsic event,

condition or standard.  For example, in Cobble Hill Nursing Home, the court enforced an

agreement in which the plaintiffs were granted "an option to purchase the premises . . . at

a price determined by the Department in accordance with Public Health Law and all

applicable rules and regulations of the Department. . . ."  74 N.Y.2d at 480.  In finding

that this option was enforceable – because it cited a methodology for determining price –

the court held that "a price term is not necessarily too indefinite because the agreement

fails to specify a specific dollar figure, or leaves fixing the amount for the future or

contains no computation formula."  Id. at 483.

Similarly, in 166 Mamaroneck Ave. Corp., the court enforced a lease

providing that if the parties were unable to agree on rent, "the same shall be fixed by

arbitration as provided by the Civil Practice Act of the State of New York."  See 78

N.Y.2d at 90.  The court explained that the parties "clearly intended to be bound by the arbitrator's determination" and that "by providing for this eventuality and agreeing to be bound by the result, the parties 'invited recourse to an objective extrinsic event, condition or standard on which the amount was made to depend.'"  Id. at 92 (quoting Joseph Martin, Jr. Delicatessen, Inc., 52 N.Y.2d at 110)).  As discussed below, the parties here did not refer to any external measure by which the value of the Rizkallahs' insurance claim would be determined.

### 2.    Discussion

Plaintiffs' breach of contract claim is predicated on an argument that Great West failed to fulfill Wesley Robin's alleged promise, in his February 28, 2001 fax, that he would "be the adjuster who works with you in restoring your property to pre-accident condition."[10]  (Amended Cmplt., ¶¶ 37-39)  Plaintiffs further allege that Great West "failed and refused to restore the property of the Plaintiffs to its pre-accident condition although due demand has been made therefore" and that Great West is "in breach of the aforesaid Agreement of February 28, 2001 by [its] continued failure and refusal to meet the[] obligations and duties undertaken by [Great West] pursuant to that said Agreement."  (Id., ¶¶ 43-44)  There is no evidence that the Rizkallahs ever approached Robin or any other Great West employee about Robin's alleged promise, however, or that – after the day of the accident – they ever sought compensation from Great West for their property damage.  Having not offered any evidence that they made a demand for performance on Great West, they have not made out even a prima facie case of breach.

---

[10]  Robin's fax also refers to compensating the Rizkallahs for any irreparable damage to their property.  (Def. R. 56.1 Stat., Ex. I)  Having offered evidence that the damage to their property was not irreparable (Pltf. R. 56.1 Stat., Exs. 3-3C), Plaintiffs appear to have abandoned any such claim here.  (Pltf. R. 56.1 Stat., Exs. 3, 4)

See Pekich v. Lawrence, 38 A.D.3d 632, 633, 832 N.Y.S.2d 259, 260 (2d Dep't 2007)

(rejecting breach of contract claim because "the record does not reflect that the plaintiff

made a demand for performance sufficient to cause [defendant] to be in default");

D'Abrau v. Smith, 240 A.D.2d 616, 617, 659 N.Y.S.2d 503, 504 (2d Dep't 1997)

(because contract implied performance would occur within a reasonable time, "a demand

by one of the parties is required to cause the other party to be in default"); Cent. Trust Co.

of Rochester v. Eastman Dev. Corp., 54 A.D.2d 609, 609, 387 N.Y.S.2d 500, 501 (4th

Dep't 1976) ("Since by its very terms the contract provided no time limit within which

performance had to be completed, defendant could not be put in default until . . .

plaintiffs had either tendered payment for the stock or demanded its issuance"); see also

22 N.Y. Jur. 2d Contracts § 328 ("Where no time for performance is fixed in a contract, a

demand is necessary in order to put a party in default").

   Here, even though the Rizkallahs had had both oral and written

communication with Robin and Great West on the day of the accident – and argue that

Robin's fax constitutes an enforceable contract between them and Great West – there is

no evidence that they thereafter made any sort of demand on Robin or the Company.

Instead, the Rizkallahs dealt solely with Andy Cope, an adjuster for FAF.  There is no

evidence, however, that Cope – during the claims adjustment process – ever indicated to

the Rizkallahs that he represented Great West, and the letterhead he used in

corresponding with the Rizkallahs contains no reference to Great West.  (Def. R. 56.1

Stat., Exs. M, P)  Accordingly, the Rizkallahs have not even offered evidence from which

a reasonable jury could find that Great West breached a promise it made to them.

Even if this Court could find that the Rizkallahs presented a demand to Great West, however, the alleged promise Plaintiffs rely on is too indefinite to sustain a breach claim.  It is undisputed that the Rizkallahs understood that their insurance claim would be the subject of a claims adjustment process – i.e., would be the subject of negotiation.  An insurance claims adjustment process is not an objective methodology or standard by which the proper amount of reimbursement can be calculated.  Accordingly, even if Robin's fax could be regarded as a promise by Robin to "work with" the Rizkallahs through a claims adjustment process, that promise is not an enforceable contract.  See Argent Elec., Inc. v. Cooper Lighting, Inc., 03 Civ. 9794 (RMB), 2005 WL 2105591, at *5 (S.D.N.Y. Aug. 31, 2005) (finding an agreement failed for indefiniteness where "there are no objective means by which the commission rate [at issue] could be rendered 'reasonably certain'"); Kosower v. Gutowitz, 00 Civ. 9011 (JGK), 2001 WL 1488440, at *5 (S.D.N.Y. Nov. 21, 2001) (finding unenforceable agreement to agree where there "was never a meeting of the minds with respect to the plaintiff's share of the partnership profits or how that share could be objectively calculated" and "plaintiff has not identified any extrinsic standard or methodology that the parties allegedly agreed to in order to calculate the plaintiff's partnership interest"); Joseph Martin, Jr. Delicatessen, Inc., 52 N.Y.2d at 110-11 (finding a renewal clause that stated "annual rentals to be agreed upon" was unenforceable because "[n]either tenant or landlord is bound to any formula"); Cooper Square Realty, Inc. v. A.R.S. Mgmt., Ltd., 181 A.D.2d 551, 551-52, 581 N.Y.S.2d 50, 51 (1st Dep't 1992) ("as no objective formula was provided for determining a commission, the exclusive sales contract was merely an agreement to agree and was unenforceable").

This case is thus not similar to <u>Cobble Hill</u> or <u>166 Mamaroneck Ave.</u> <u>Corp.</u> – relied on by Plaintiffs – but rather falls within a line of authority holding that agreements that leave material terms to parties' future negotiations are unenforceable. <u>See</u> <u>Alter v. Bogoricin</u>, 97 Civ. 0662 (MBM), 1997 WL 691332, at *7 (S.D.N.Y. Nov. 6, 1997) (finding that a profit sharing provision is "an agreement to agree" because "it leaves the precise determination of [a profit] share to a future formula yet to be developed"); <u>Willmott v. Giarraputo</u>, 5 N.Y.2d 250, 252-53 (1959) (option agreement stating "the payment of interest and amortization of principal shall be mutually agreed upon at the time of entering into a more formal contract" is unenforceable); <u>Del Castillo</u> <u>v. Bayley Seton Hosp.</u>, 232 A.D.2d 602, 604 649 N.Y.S.2d 41, 43 (2d Dep't 1996) (finding that a document was an "agreement to agree" because "[t]he parties did not commit themselves to a renewal or modification of the contract; they only agreed to negotiate"); <u>Blakely v. McMurray</u>, 110 A.D.2d 998, 999, 488 N.Y.S.2d 286, 287-88 (2d Dep't 1985) (finding that certain letters were not enforceable contracts because they "clearly demonstrate[] that further negotiations were contemplated regarding the method of financing the purchase").

Here, Great West did no more than agree to "work with [the Rizkallahs] in restoring [their] property to pre-accident condition."  There was no meeting of the minds as to what Great West would pay to compensate the Rizkallahs for their property damage, and no meeting of the minds as to how such compensation would be calculated.  There was no reference to an outside methodology or to an extrinsic event, condition or standard by which compensation would be determined.  Under the well established New

York law cited above, such an agreement to negotiate does not constitute an enforceable contract.

### B.    Great West Is Entitled to Summary Judgment on Plaintiffs' Fraudulent Misrepresentation Claim

"To state a claim for fraudulent misrepresentation under New York law a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 186-87 (2d Cir. 2004)); see also Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 4 N.Y.2d 403, 406-07 (1958) ("To maintain an action based on fraudulent representations, . . .  it is sufficient to show that the defendant knowingly uttered a falsehood intending to deprive the plaintiff of a benefit and that the plaintiff was thereby deceived and damaged."). "'Under New York law, each element of a fraudulent misrepresentation claim must be proven by clear and convincing evidence.'" Villani v. Nat'l Marine Corp., No. 04 Civ. 654, 2008 WL 1995121, at *3 (W.D.N.Y. May 6, 2008) (quoting Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 784-85 (2d Cir. 2003)).

The Rizkallahs have not offered any evidence – much less "clear and convincing evidence" – of most of the elements of fraudulent misrepresentation.  They have not offered evidence that Robin made a "material false representation," because they have not even established that Robin refused to "work with" them in their efforts to restore their property to its pre-accident condition; that he refused to participate with them in a claims adjustment process; or that Great West refused to compensate them for their property damage.  Similarly, Plaintiffs have not offered evidence demonstrating that

Robin had no intention of fulfilling the alleged promise in his fax, because they have not

offered evidence that Robin or Great West refused to take any action promised in the

February 28, 2001 fax.  (Def. R. 56.1 Stat., Ex. I)

Even if the Rizkallahs had offered evidence that Robin made a false

representation in his fax, and that he never intended to "work with" the Rizkallahs to

return their property to its pre-accident condition, a reasonable jury could not find that the

Rizkallahs had offered clear and convincing evidence that their alleged reliance on

Robin's fax was reasonable.  Robin's statement that he would "be the adjuster who works

with you in restoring your property to pre-accident condition or compensating you for

damage that is irrepairable [sic]" is too indefinite to justify reasonable reliance.  The New

York Court of Appeals' decision in George Backer Mgmt. Corp. v. Acme Quilting Co.,

46 N.Y.2d 211, 220 (1978) is instructive.

In George Backer, the Court of Appeals rejected a fraud claim premised

on a lessor's representation that the cost of any rent increase to the lessee would "in no

event . . . exceed an amount equal to four or five per cent of the base rate for any

particular year."  46 N.Y.2d at 216.  The Court held that this statement

> sets forth no reasonable ground for reliance.  The very indefiniteness of
> the figures confirms this statement as an expression of opinion rather than
> of fact.  Above all, it did not relate to a concrete fact or a past or existing
> event.  At best, it was no more than an expression of expectations as to
> labor agreements which had not yet been negotiated and the outcome of
> which, as both parties knew, could not be foretold.  As a matter of law,
> then, it cannot form the basis for a claim of misrepresentation.

Id. at 220.

Similarly here, Robin's offer to "work with" the Rizkallahs in restoring

their property to its pre-accident condition does not constitute a statement of fact.  It does

not constitute a representation that Great West will take any particular steps to restore

Plaintiffs' property or pay any particular sum to accomplish that result.  At best, it is an

expression of Robin's expectations about the claims adjustment process.  It is undisputed,

however, that both Robin and the Rizkallahs understood that the claims adjustment

process was a negotiation, "the outcome of which . . . could not be foretold."  Id. at 220.

    To the extent that the Rizkallahs are claiming that they understood Robin

to be representing that the Rizkallahs and Great West would come to an agreement

concerning compensation for Plaintiffs' property damage, it is well settled law that

"'[m]ere promissory statements as to what will be done in the future are not

actionable.'"[11]  Sabo v. Delman, 3 N.Y.2d 155, 160 (1957) (quoting Adams v. Clark, 239

N.Y. 403, 410 (1925)); see also Channel Master Corp. v. Aluminum Limited Sales, Inc.,

4 N.Y.2d 403, 408 (1958) (fraud "is not a case of prophecy and prediction of something

which it is merely hoped or expected will occur in the future"); Goldman v. Strough Real

Estate, Inc., 2 A.D.3d 677, 678, 770 N.Y.S.2d 94, 94 (2d Dep't 2003) (same).  Because

the Rizkallahs have not made out a prima facie case of fraudulent misrepresentation –

much less demonstrated clear and convincing evidence of each element of this claim –

Great West is entitled to summary judgment concerning this claim.

  **C.**  **Great West Is Entitled to Summary Judgment**
     **on Plaintiffs' Real Property Claim**

    At all relevant times, Section 861 of the Real Property Act provided:

---

[11]  Although a "promise [that] was actually made with a preconceived and undisclosed
intention of not performing it . . . constitutes a misrepresentation of a material existing
fact" sufficient to support a fraud claim, Sabo, 3 N.Y.2d at 160, the Rizkallahs presented
no evidence to support their assertion that Robin's alleged promise was "false and
fraudulent at the time made."  (Amended Cmplt., ¶ 51)

> If any person cuts down or carries off any wood, underwood, tree
> or timber, or girdles or otherwise despoils a tree on the land of
> another, without the owner's leave, . . .  an action may be
> maintained against him by the owner. . . .

N.Y. Real. Prop. Act. § 861(1) (1963).

Great West argues that it cannot be held liable under this provision because the Rizkallahs consented to having their trees cut down in order to permit the removal of the tractor-trailer from their property.  Because the statute provides for liability only where trees are removed "without the owner's leave," Great West argues that it cannot be found liable.  Plaintiffs counter that although they consented to the removal of the trees, their consent was invalid because it was obtained by fraud.

As discussed above, Plaintiffs have not made out by the required clear and convincing standard their claim of fraudulent misrepresentation.  Accordingly, the consent they gave with respect to the removal of the trees from their property was not – at least as to Great West – vitiated by fraud.  Accordingly, Great West is entitled to summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, Great West's motion for summary judgment is

GRANTED.[12]  The Clerk of the Court is directed to terminate the motion [Docket No.

28].

Dated:       New York, New York
             September 21, 2009

                              SO ORDERED.

                              Paul G. Gardephe
                              Paul G. Gardephe
                              United States District Judge

---

[12]  Great West has not moved for summary judgment with respect to the fifth cause of
action for trespass, which names it as a defendant.  (Amended Cmplt., ¶ 62)